IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

<table>
<tr><td>ALABAMA MUNICIPAL<br>INSURANCE CORPORATION, a<br>non-profit corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>MUNICH REINSURANCE<br>AMERICA, INC., a foreign<br>corporation,<br><br>    Defendant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td><br><br><br><br><br>CIVIL ACTION NO.<br>2:20cv300-MHT<br>(WO)</td></tr>
</table>

OPINION ON AMIC'S HANCEVILLE CLAIM

This litigation involves disputes between plaintiff
Alabama Municipal Insurance Corporation (AMIC) and
defendant Munich Reinsurance America, Inc. over
assertions that each party failed to honor its
obligations to the other under a series of reinsurance
contracts, known as "treaties." Several of the
disputes also involve competing interpretations of
AMIC's underlying insurance contracts with its clients,
which bind Munich under the terms of the reinsurance
treaties. AMIC asserts five breach-of-contract claims

and seeks compensatory damages and pre-judgment interest as remedy. Munich denies it breached any treaties and asserts six counterclaims, requesting declaratory judgments from this court as remedy.

Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity).

This lawsuit is now before the court on Munich's motion for summary judgment on one of AMIC's breach-of-contract claims: the 'Hanceville claim,' which arises out of AMIC's insurance policy with the Waterworks and Sewer Board of the City of Hanceville, Alabama. For the reasons below, the court concludes that it should deny Munich's request for summary judgment on this claim.

## I. Legal Standard

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). The court must view the admissible evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Background

### A. Overview of Parties and Treaty Structure

AMIC is a non-profit insurance company wholly owned by Alabama municipalities and regulated by the Alabama Department of Insurance. It is chartered to insure Alabama's cities, towns, and subsidiary corporate entities, including bus services and police forces.

3

Munich is a national provider of property and casualty reinsurance based in Princeton, New Jersey.

For at least ten years, between May 1, 2005 and October 31, 2015, AMIC and Munich entered into annual reinsurance agreements, formally known as "Casualty Excess of Loss Reinsurance Agreements," or treaties, wherein Munich took on a portion of AMIC's risk in exchange for a portion of the premiums AMIC received from its insured clients.[1]   All of the underlying incidents at issue in this case occurred during that ten-year period.

This litigation began in May 2020, when AMIC accused Munich of five counts of breach of contract

_____

1.   The parties do not dispute that Munich and AMIC were bound by reinsurance agreements during this approximately ten-year period, which is the time period relevant to this litigation.   Until September 2006, Munich was incorporated under a different name, American Re-Insurance Company, which is reflected in the text of the treaties but not otherwise germane to this dispute.   *See American Re to Become Munich Re America Starting in Sept.*, Insurance Journal (Aug. 3, 2006), https://www.insurancejournal.com/news/national/2006/08/03/71076.htm.

based on five insurance claims that AMIC submitted to Munich between 2015 and 2018, none of which Munich agreed to reimburse in full.[2]  Munich denied that it breached any of its treaties with AMIC and filed six counterclaims, seeking declaratory relief regarding the interpretation of other treaties between Munich and AMIC and other contracts held by AMIC with its insured clients.

Munich filed a motion for summary judgment on all eleven claims and counterclaims.  However, only one of AMIC's claims is now before the court: as stated, the Hanceville claim, which is a breach-of-contract claim arising out of AMIC's policy with the Waterworks and Sewer Board of the City of Hanceville.

---

2. AMIC also asserted bad-faith refusal-to-pay claims against Munich, but those claims were dismissed earlier in this litigation. *See Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, <u>526 F. Supp. 3d 1133</u> (M.D. Ala. 2021) (Thompson, J.) (concluding that Alabama law does not extend the tort of bad faith to the reinsurance context).

## B. Factual Background

The factual allegations underlying the Hanceville claim, taken in the light most favorable to AMIC, are as follows.  Between July 2005 and July 2010, AMIC held a commercial general liability policy with the Waterworks and Sewer Board of the City of Hanceville. The Hanceville Board's facility was responsible for processing sewage and contaminated water throughout Cullman County, Alabama.  At all times relevant to this litigation, the board had a permit from the Alabama Department of Environmental Management to discharge into Mud Creek treated waste that had had pollutants removed to the required standard.

In July 2008, 12 residents of Cullman County, Alabama filed a lawsuit against the following defendants: the Hanceville Water Works and Sewer Board; Sally Alexander, individually and in her capacity as co-manager of the board's facility; and three private companies alleged to have participated in the operation and maintenance of the facility.  *See* Complaint (Doc.

90-8) at 4.

The plaintiffs in the lawsuit against the Hanceville Board and others all resided and owned property along Mud Creek; they asserted claims for negligence, private nuisance, trespass, and wanton conduct in response to the alleged discharge of raw and untreated sewage, partially treated sewage, and other contaminants in Mud Creek and on their properties. They sought bodily injury and property damages, as well as injunctive relief to prevent any additional release of raw sewage into Mud Creek.

In 2014, when the parties reached a settlement in the Mud Creek lawsuit, its terms released the defendants from all further causes of action, demands, and claims arising from "the Incidents." Settlement Agreement (Doc. 114-4) at 5. The plaintiffs acknowledged that the defendants were paying "in order to avoid the costs and uncertainty of further litigation." *Id*. at 6-7.

In return, the defendants agreed to pay plaintiffs

a combined total of $ 1,300,000.  The Hanceville Board,
specifically, assumed responsibility for $ 100,000 of
the total cost.[3]  *See id*. at 7.

As a result of the Mud Creek litigation, AMIC
reports that it incurred a loss of $ 680,153.70 (which
includes the $ 100,000 plus the costs of the
litigation).  AMIC combined these costs into a single
reimbursement request, which it submitted to Munich
under the 2007 reinsurance treaty period, which ran
from November 1, 2007, through November 1, 2008.  *See*
2007 Treaty (Doc. 87-5) at 23.  AMIC requested a
reimbursement of $ 330,153.70--the total cost of its
Mud Creek litigation-related loss, $ 680,153.70, less a
$ 350,000 per-occurrence retention mandated by the
terms of the 2007 treaty.[4]

---

3.  As AMIC explained during oral argument on April
12, 2023, the Hanceville Board's assumed portion of the
settlement--$ 100,000--is the statutory cap placed by
the State of Alabama for settlements with government
entities "for any damage or loss of property arising
out of a single occurrence."  Ala. Code § 11-93-2.

4.  During the approximately ten-year period at
issue in this litigation, the treaties between AMIC and

AMIC explains that it filed all costs accrued during the Mud Creek litigation under its 2007 reinsurance treaty with Munich because all of the costs were the result of one inciting "occurrence"--a January 2008 flood involving approximately 2,000,000 gallons of untreated raw sewage, which was specifically mentioned in the Mud Creek lawsuit filed in July 2008.  AMIC argues that this flooding incident was the singular "occurrence" that triggered its insurance policy with the Hanceville Board, as well as Munich's obligations under the corresponding reinsurance treaty.

In response, Munich defends its refusal to reimburse AMIC, arguing that the plaintiffs in the Mud Creek litigation experienced varying degrees of property damage every year from 2005 through 2009.

---

Munich generally took effect in the middle or midst of the calendar year (either on May 1 or Nov. 1, depending on the year in question).  *See, e.g.*, the 2005 Reinsurance Treaty (Doc. 87-2) (in effect from 12:01 A.M. on May 1, 2005 through 12:01 A.M. on May 1, 2006); the 2013 Reinsurance Treaty (Doc. 87-10) (in effect from Nov. 1, 2013 through Oct. 31, 2014, "both days inclusive").  For clarity and convenience, the treaties

Munich argues that the Mud Creek lawsuit itself referenced improper discharge beginning as early as 2006, and explains that the Mud Creek plaintiffs acknowledged as much in depositions they gave during the litigation period. As a result, Munich asserts that AMIC should have taken at least five retentions of $ 350,000 each, one for each of the years in which an insurance policy was triggered by some occurrence of sewage flooding, and apportioned its costs over that entire period. These retentions would total at least $ 1,750,000—an amount greater than the reimbursement AMIC sought.


### III. Analysis

As stated, Munich has moved for summary judgment against AMIC on the Hanceville claim. The parties agree that this dispute is governed by Alabama law. The court must now determine whether Munich has shown that it is entitled to judgment as a matter of law.

---

in this opinion are referenced by the calendar year in

This court turns first to basic contract principles in order to determine whether a genuine issue of material fact remains to be decided. The inquiry begins by examining Munich's obligations to AMIC under the treaties held between the parties, and AMIC's obligations to the Hanceville Board under the underlying insurance policy at issue in this claim.

"Treaty reinsurance" is generally understood as a contract *to* reimburse: an agreement that a reinsurer will provide reimbursement on policies the insurer issues during a set period of time, even if the insurer has not yet written or issued those policies when the treaty is adopted. *See*, e.g., Graydon Staring et al., Law of Reinsurance § 2:4 (2022 ed.).

Alabama law is in line with these general principles, and, under it, reinsurance treaties are a form of indemnity contracts to which general contract principles apply. *See Melco System v. Receivers of Trans-America Ins. Co.*, 105 So. 2d 43, 47 (Ala. 1958).

---

which they first took effect.

11

In accordance with those principles, courts are required to "enforce an unambiguous, lawful contract, as it is written." *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 35 (Ala. 1998). "When interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state." *Id*. at 36.

However, "if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by the jury," and summary judgment is not appropriate. *McDonald v. U.S. Die Casting & Development Co.*, <u>585 SO.2d 853, 855</u> (Ala. 1991).

This court, therefore, begins its analysis with the text of the 2007 treaty. Munich's obligations with AMIC under it were as follows:

> "The Reinsurer agrees to indemnify the Company, on an excess of loss basis, for Ultimate Net Loss paid by the Company as a result of losses occurring <u>under the Company's Coverage Documents</u> attaching during the term of this Agreement ...

> "... The term 'Coverage Document' shall mean the Company's liability to its insureds under the agreements between the Company and its insureds []."

Parties' Reinsurance Treaty for 2007 (Doc. 87-5) at 4 (emphasis added).

The above treaty provision establishes that Munich's obligations to AMIC were directly tied to AMIC's obligations to its insured--in this case, the Hanceville Board. *See Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc. (The Spanish Fort Claim)*, No. 2:20CV300-MHT, 2023 WL 2138904, at *3 (M.D. Ala. Feb. 21, 2023) (Thompson, J.) (explaining that AMIC's dispute with Munich over a similar treaty provision between the two was directly tied to AMIC's obligations under its insurance policy with the insured Spanish Fort).

The court turns to the text of the Hanceville Board's insurance policy with AMIC during the 2007 Treaty period, which reads in part as follows: "[AMIC] will pay those sums that the insured becomes legally

13

obligated to pay as Damages because of Bodily Injury or Property Damage to which this insurance applies." Hanceville 2007 Policy (Doc. 90-5) at 7.[5]  The 2007 policy then states that the insurance applies to property damage "only if ... the Bodily Injury or Property Damage occurs *during the policy period*." *Id.* (emphasis added).  The 2007 policy period was from around July 2007 through July 2008.

There is extensive Alabama case law to support a plain-language reading of policies explicitly limiting coverage for any given property damage to the policy period in which that damage occurred.  *See Alabama Mun. Ins. Corp.,* 2023 WL 2138904, at *5; *see also Liberty Mut. Ins. Co. v. Wheelwright Trucking Co. Inc.,* 851 So.

_____

5.  As with the reinsurance treaties, the insurance policies between AMIC and the Hanceville Board generally took effect in the middle of the calendar year.  AMIC provided general commercial liability insurance coverage to the Hanceville Board beginning on July 17, 2005 (Doc. 90-3 at 2), and subsequent policies and/or policy renewals took effect annually, always on the same day, through at least July 17, 2009 (Doc. 90-7 at 2). For purposes of clarity, each insurance policy period is referred to by the year in which it first took effect.

**14**

2d 466, 482 (Ala. 2002). For this reason, if the record definitively established that the Hanceville Board was legally obligated to pay for a property damage occurrence that occurred prior to the July 2007-July 2008 policy period, AMIC would not be required, under the terms of this specific insurance policy, to provide coverage for that earlier damage. Munich would not owe AMIC any reimbursement for costs outside of the coverage that AMIC was obligated to provide.

However, the record in this case, and the parties' briefs on Munich's motion for summary judgment, do not definitively establish which specific property damage triggered the Hanceville Board's legal obligation to pay, nor the underlying occurrence or occurrences that caused the damage for which the board was liable.

To prove that there is no genuine dispute as to any material fact to support its assertions that AMIC should have taken at least five retentions of $ 350,000 each, one for each of the years in which an insurance

policy was triggered by some occurrence of sewage flooding, and should have apportioned its costs over that entire period, for a total of at least $ 1,750,000 (an amount greater than the reimbursement AMIC sought), Munich offers the Mud Creek plaintiffs' original complaint as well as depositions from them describing incidents of varying severity that occurred every year from 2005 to 2009, before and after the January 2008 sewage flood.

Munich notes that the complaint in the underlying Mud Creek lawsuit asserts that the defendants had been on notice of improper discharge problems at the Hanceville Board's facility "since 2006," but that the defendants continued to "perpetuate a pattern of conduct that ignored known problems." Complaint (Doc. 90-8) at 5-6. As a result, "before and since January 1, 2008, specifically on January 21st, 30th, and 31st, the [f]acility discharged approximately two million (2,000,000) gallons of untreated raw sewage into Mud Creek." *Id*. at 6. The complaint goes on to assert

that "these instances of dumping raw sewage into Mud Creek are just the most recent in a long history of such conduct." *Id*. (emphasis added).

Subsequent depositions of the Mud Creek lawsuit's plaintiffs, excerpted in Munich's motion for summary judgment, establish that the plaintiffs did begin experiencing at least some degree of disruption to their respective properties as early as 2005. Plaintiff Jack Howell, for example, testified that "all this mess" happened "all the time ... [in] 2008 ... 2007, 2006 and 2005." Munich Brief for Summary Judgment (Doc. 97) at 27. Plaintiff Oscar Nichols described tap water smelling like feces beginning "probably back in 2006," while plaintiff Mike Cook testified to the presence of "rubbish," such as toilet paper and tampons, on his property beginning in "probably ... 2007." *Id*. at 27-28. Further, plaintiff James White testified that there was an additional sewage spill on his property in May 2009, almost a year after the lawsuit was filed. *Id*. at 28.

17

In light of these facts, the burden shifts to the nonmoving party, AMIC, to produce evidence that a reasonable factfinder could return a verdict in its favor, despite the contents of these depositions and the other evidence that Munich has produced. To meet its burden, AMIC focuses on the text of the plaintiffs' Mud Creek complaint again, emphasizing that its description of damages is vague. AMIC argues that the complaint's descriptions of egregious conduct leading up to the January 2008 sewage flood were merely context for the flood itself, and that the plaintiffs' impetus for the lawsuit was primarily to recover damages for the severe property damages caused by the 2008 flood specifically.[6]

---

6. In support of its interpretation of the Mud Creek plaintiffs' lawsuit, AMIC also offers a 2011 Alabama Supreme Court opinion in which the facts of the lawsuit are briefly described. *See* AMIC Brief Opposing Summary Judgment (Doc. 113) at 34. AMIC offers *Ex parte Novus Utilities, Inc.*, 85 So. 3d 988, 990 (Ala. 2011), as evidence that "the Alabama Supreme Court views the Hanceville litigation as focused on January 2008," and accuses Munich of "second-guess[ing]" the Alabama Supreme Court. AMIC Brief Opposing Summary Judgment (Doc. 113) at 112. This court soundly rejects

As explained above, AMIC contends that it correctly submitted its reimbursement claim for $ 350,153.70 ($ 680,153.70 less a retention of $ 350,000) under the 2007 reinsurance treaty because all of the costs for which the Hanceville Board was legally liable were triggered by just one inciting "occurrence" under the 2007 policy--the January 2008 sewage flooding--and the property damage it caused, which arose during that same policy period.  The January 2008 flood and associated property damage were specifically mentioned in the original Mud Creek complaint.

The court finds that, even considering the Mud Creek plaintiffs' testimonies, the existence of property damage prior to January 2008 (and whether there were any other occurrences during or outside of the 2007 policy period that would trigger additional

---

AMIC's characterization of *Ex parte Novus*, which focused on a completely separate procedural question involving the Mud Creek plaintiffs' ability to add defendants to their complaint.  The Alabama Supreme Court did not rule on, or even consider, the property damage question that is central to the instant case.

$ 350,000 retentions), for which the Hanceville Board was legally liable, remains in dispute.

Beyond the existence of the property damage itself, Munich also fails to establish that the plaintiffs brought the Mud Creek lawsuit in order to recover damages for these earlier occurrences, rather than in response to the January 2008 flooding, which involved the release of approximately two million gallons of untreated raw sewage.

On the other hand, AMIC has not conclusively established that all of the damages for which the Hanceville Board was legally liable were restricted to those caused by the January 2008 flood. The Hanceville Board was legally obligated to pay $ 100,000 in damages as a result of the settlement--but neither the text of the settlement nor the original complaint, as explained above, concretely define the specific injury for which the Mud Creek plaintiffs sought relief.

In short, Munich has not conclusively established

---

The persuasive value of *Ex parte Novus*' passing mention

the evidence supports it as a matter of law, and AMAC has established that a factfinder could find that the evidence supports it.

As other courts have recognized, "fixing the date of loss is normally difficult in a hazardous waste claim." *Com. Union. Ins. Co. v. Seven Provinces Ins. Co., Ltd.*, 9 F.Supp.2d 49, 58 (D. Mass. 1998) (Gertner, J.). "The long-tail toxic and environmental claims of recent years raise complex problems of allocations of losses to policies and policy years, and hence to the reinsurances for those years." Staring, Law of Reinsurance § 18:10 (2022 ed.).

Nevertheless, the court's finding of an evidentiary dispute with regard to the timing of the property damage at issue here does not conclude the inquiry. Instead, the court looks back to the text of the treaty between AMIC and Munich for any provision relating to the allocation of settlements in circumstances such as this one.  The question before this court is how AMIC

---

of the alleged property damage is negligible at best.

and Munich are obligated to proceed in situations where the nature of the period of the relevant property damage is, as here, unclear.

Some reinsurers have responded to difficulty presented in circumstances such as these by incorporating loss-settlement clauses into their treaties, clearly describing the obligations of both the insurer and the reinsurer in the face of prospective or negotiated settlements. *See, e.g.*, *Fireman's Fund Ins. Co. v. OneBeacon Ins. Co.*, 49 F.4th 105, 112 (2d Cir. 2022) (describing "follow-the-settlements" clauses that include insurers' post-settlement allocation decisions); Staring, Law of Reinsurance § 18:3 (compiling a list of alternative clauses adopted in reinsurance treaties).

In the treaty between AMIC and Munich, however, there is no such clause. The court finds no evidence of a "follow-the-settlements clause," which would bind Munich to AMIC's allocation decision, nor does it find evidence that AMIC was obligated to make its

allocations based on deposition testimony that would support Munich's reading of the complaint. Moreover, both the treaty and the underlying insurance coverage policy appear silent as to which party otherwise has the right to define the property damage for which AMIC's underlying insured was liable in the absence of such clauses. And the court is without discretion to fashion and incorporate into the parties' policies language that they, for whatever reason, omitted to include.

Further, although *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co. Inc.*, 851 So. 2d 466 (Ala. 2002), *Commercial Union Ins. Co. v. Sepco Corp.*, 918 F.2d 920 (11th Cir. 1990), and other cases cited by Munich do establish that a pro rata apportionment of costs may be appropriate in certain circumstances, and particularly where damage occurred over the course of multiple policy periods, these cases do not support the conclusion that this court has the authority to fashion a pro rata scheme that would resolve the factual

23

disputes presented here.

In *Wheelwright Trucking*, the state court, unlike this court, was not confronted with underlying factual disputes. The state court did not resolve facts on summary judgment as Munich is asking this court to do.

Meanwhile, a comparison between the instant case and *Sepco* is inapposite. There the state trial court "administratively" fashioned a "pro rata scheme," but, in discussing--and, in particular, reviewing the trial court's application of--that scheme, the Alabama Supreme Court carefully noted that, "This administrative arrangement is not challenged on this appeal." 918 F.2d at 922. Munich's contention that this court has the authority to fashion and apply such a scheme finds no support in the Alabama Supreme Court's decision in *Sepco*. Moreover, *Sepco* involved factually and legally complex asbestos litigation, with insurance policy language (including definitions of such terms as "occurrence" and "injury") and court-recognized theories (such as "injurious

24

exposure") not applicable here.  The *Sepco* case and the instant case are apples-to-oranges in many crucial respects.  In short, the Sepco case in no way supports some broad notion that this court has some independent authority to do what the parties should have done when they drafted their treaties: develop and apply a scheme to address the circumstances presented here.  Moreover, even if this court had such authority, *Sepco* does not support the conclusion that this court should develop and apply a pro rata solution in a way such that Munich should prevail as a matter of law based on the facts presented.

Viewing the admissible evidence in the light most favorable to AMIC, the court holds that the underlying complaint and settlement between the Hanceville Board and the Mud Creek plaintiffs, both vaguely written, could be reasonably interpreted as focusing on the 2008 sewage flood; *or* on the sewage flood and all subsequent damage; *or* on all of the damage the Mud Creek plaintiffs described in their depositions, beginning as

early as 2005.  The facts are in dispute.  In turn, whether one or two or several occurrences, and thus whether one or two or several $ 350,000 retentions, are in play is in dispute.

Because whether the settlement of the Mud Creek lawsuit addressed only damages occurring in 2008 is in dispute and because the treaty between AMIC and Munich contains no clauses with regard to the settlement allocation process, the court finds that there is a genuine dispute of material fact in the Hanceville claim.  As a result, summary judgment is not appropriate.  Munich's motion for summary judgment should be denied, and this case should proceed to jury trial on the Hanceville claim.

***

However, because there are other claims and counterclaims between the parties to be resolved, the court will not yet enter a summary-judgment order with regard to AMIC's Hanceville claim.  Instead, after the other claims and counterclaims are resolved, the court

26

will meet with counsel for the parties to discuss what the next steps should be on the Hanceville claim.

DONE, this the 26th day of April, 2023.

     /s/ Myron H. Thompson     
UNITED STATES DISTRICT JUDGE